United States Code     Effective: October 19, 2009
Title 18. Crimes and Criminal Procedure
Part II. Criminal Procedure
Chapter 223. Witnesses and Evidence
§ 3512. Foreign requests for assistance in criminal investigations and prosecutions

(a) Execution of request for assistance.--

(1) In general.--Upon application, duly authorized by an appropriate official of the Department of Justice, of an Attorney for the Government, a Federal judge may issue such orders as may be necessary to execute a request from a foreign authority for assistance in the investigation or prosecution of criminal offenses, or in proceedings related to the prosecution of criminal offenses, including proceedings regarding forfeiture, sentencing, and restitution.

(2) Scope of orders.--Any order issued by a Federal judge pursuant to paragraph (1) may include the issuance of--

(A) a search warrant, as provided under Rule 41 of the Federal Rules of Criminal Procedure;

(B) a warrant or order for contents of stored wire or electronic communications or for records related thereto, as provided under section 2703 of this title;

(C) an order for a pen register or trap and trace device as provided under section 3123 of this title; or

(D) an order requiring the appearance of a person for the purpose of providing testimony or a statement, or requiring the production of documents or other things, or both.

(b) Appointment of persons to take testimony or statements.--

(1) In general.--In response to an application for execution of a request from a foreign authority as described under subsection (a), a Federal judge may also issue an order appointing a person to direct the taking of testimony or statements or of the production of documents or other things, or both.

(2) Authority of appointed person.--Any person appointed under an order issued pursuant to paragraph (1) may--

(A) issue orders requiring the appearance of a person, or the production of documents or other things, or both;

(B) administer any necessary oath; and

(C) take testimony or statements and receive documents or other things.

(c) Filing of requests.--Except as provided under subsection (d), an application for execution of a request from a foreign authority under this section may be filed--

(1) in the district in which a person who may be required to appear resides or is located or in which the documents or things to be produced are located;

(2) in cases in which the request seeks the appearance of persons or production of documents or things that may be located in multiple districts, in any one of the districts in which such a person, documents, or things may be located; or

(3) in any case, the district in which a related Federal criminal investigation or prosecution is being conducted, or in the District of Columbia.

(d) Search warrant limitation.--An application for execution of a request for a search warrant from a foreign authority under this section, other than an application for a warrant issued as provided under section 2703 of this title, shall be filed in the district in which the place or person to be searched is located.

(e) Search warrant standard.--A Federal judge may issue a search warrant under this section only if the foreign offense for which the evidence is sought involves conduct that, if committed in the United States, would be considered an offense punishable by imprisonment for more than one year under Federal or State law.

(f) Service of order or warrant.--Except as provided under subsection (d), an order or warrant issued pursuant to this section may be served or executed in any place in the United States.

(g) Rule of construction.--Nothing in this section shall be construed to preclude any foreign authority or an interested person from obtaining assistance in a criminal investigation or prosecution pursuant to section 1782 of title 28, United States Code.

(h) Definitions.--As used in this section, the following definitions shall apply:

(1) Federal judge.--The terms "Federal judge" and "Attorney for the Government" have the meaning given such terms for the purposes of the Federal Rules of Criminal Procedure.

(2) Foreign authority.--The term "foreign authority" means a foreign judicial authority, a foreign authority responsible for the investigation or prosecution of criminal offenses or for proceedings related to the prosecution of criminal offenses, or an authority designated as a competent authority or central authority for the purpose of making requests for assistance pursuant to an agreement or treaty with the United States regarding assistance in criminal matters.

(Added Pub.L. 111-79, § 2(4), Oct. 19, 2009, 123 Stat. 2087.)
18 U.S.C.A. § 3512, 18 USCA § 3512
Current through P.L. 111-86 (excluding P.L. 111-84) approved 10-29-09

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

In Re:  Request from Argentina Pursuant to the
Treaty Between the Government of the United States
of America and the Government of the Republic of
Argentina on Mutual Legal Assistance in Criminal
Matters in the Matter of Federico Garcia Aparicio
_____/

## SAMPLE

### COMMISSIONER'S SUBPOENA

TO:   _____

_____

I, Commissioner Daniel J. Bernstein, an Assistant United States Attorney for the Southern

District of Florida, acting pursuant to the Treaty Between the Government of the United States of

America and the Government of the Republic of Argentina on Mutual Legal Assistance in

Criminal Matters, U.S.-Arg., Dec. 4, 1990, S. TREATY DOC. NO. 102-18 (1991), 18 U.S.C. §

3512, and this Court's order thereunder dated _____, for the purpose of rendering

assistance to the Republic of Argentina, command that you appear before me in Room_____ ,

located at _____, in the city and state of _____, on

_____, 20___, at _____ AM/PM to provide testimony/documents regarding an alleged

violation of the laws of Argentina, namely, investment fraud, and among other violations, and that

at the place and time aforesaid you provide the following:

**[identify documents etc. to be produced]**

Failure to attend and provide testimony/said documents, or for disclosure of the existence

of the subpoena, you may be deemed guilty of contempt and liable to penalties under the law.


_____
Commissioner Daniel J. Bernstein
Assistant United States Attorney


Dated: _____


2

1 of 1 DOCUMENT

U.S. Treaties on LEXIS

ARGENTINA

TREATY WITH ARGENTINA ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL
MATTERS

TREATY DOC. 102-18

*1990 U.S.T. LEXIS 224*

December 4, 1990, Date-Signed

February 9, 1993, Date-In-Force

**STATUS:**
  [*1]   Signed at Buenos Aires on December 4, 1990. Entered into force February 9, 1993.

MESSAGE FROM THE PRESIDENT OF THE UNITED STATES

TRANSMITTING THE TREATY BETWEEN THE GOVERNMENT OF THE UNITED
STATES OF AMERICA AND THE GOVERNMENT OF THE REPUBLIC OF AR-
GENTINA ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS, SIGNED
AT BUENOS AIRES ON DECEMBER 4, 1990

**TEXT:**
102D CONGRESS

  SENATE

  **LETTER OF TRANSMITTAL**

  THE WHITE HOUSE, *October 31, 1991.*
*To the Senate of the United States:*

    With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty between
the Government of the United States of America and the Government of the Republic of Argentina on Mutual Legal
Assistance in Criminal Matters, signed at Buenos Aires on December 4, 1990. I transmit also, for the information of the
Senate, the Report of the Department of State with respect to the Treaty.

    The Treaty is one of a series of modern mutual legal assistance treaties being negotiated by the United States in or-
der to counter criminal activities more effectively. The Treaty should [*2]   be an effective tool to assist in the prosecu-
tion of a wide variety of modern criminals, including members of drug cartels, "white collar criminals," and terrorists.
The Treaty is self-executing.

    The Treaty provides for a broad range of cooperation in criminal matters. Mutual assistance available under the
Treaty includes: (1) the taking of testimony or statements of witnesses; (2) the provision of documents, records, and
evidence; (3) the execution of requests for searches and seizures; (4) the serving of documents; and (5) the provision of
assistance in locating, tracing, immobilizing, seizing and forfeiting proceeds of crime, and restitution to the victims of
crime.

    I recommend that the Senate give early and favorable consideration to the Treaty and give its advice and consent to
ratification.

    GEORGE BUSH.

1990 U.S.T. LEXIS 224, *

## LETTER OF SUBMITTAL

DEPARTMENT OF STATE,

*Washington, DC, October 17, 1991.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Treaty between the Government of the United States of America and the Government of the Republic of Argentina on Mutual Legal Assistance in Criminal Matters (the "Treaty"), signed at Buenos Aires on December [*3]   4, 1990. I recommend that the Treaty be transmitted to the Senate for its advice and consent to ratification.

The Treaty covers mutual legal assistance in criminal matters. In recent years, similar bilateral treaties have entered into force with the Bahamas, Canada, Italy, Mexico, the Netherlands, Switzerland, Turkey and the United Kingdom concerning the Cayman Islands; and others have been concluded and ratified by the United States (but have not yet entered into force) with Belgium, Colombia, Morocco, and Thailand; or have been concluded and signed with Jamaica, Nigeria, Panama, Spain and Uruguay. The Treaty contains many provisions similar to those in the other treaties.

The Treaty is designed to be self-executing and will not require implementing legislation.

Article 1 requires mutual assistance in the prevention, investigation, and prosecution of crime and in all related proceedings, whether criminal, civil or administrative. This would include, for example, cooperation in proceedings, which may be civil in nature, to forfeit the proceeds of drug trafficking. There is no double criminality requirement for cooperation under the Treaty; a Requested State is required to execute   [*4]   a request without regard to whether the subject matter would constitute an offense under its own laws. Assistance under the Treaty will include: provision of documents, records and evidence; executing requests for searches and seizures; immobilizing assets; assisting in proceedings relating to forfeiture, restitution and collection of fines; obtaining witness testimony; and other forms of assistance. The article explicitly states that it is not intended to create rights in private parties to obtain, suppress, or exclude any evidence, or to impede the execution of any request under the Treaty.

Article 2 defines the Central Authorities for purposes of the Treaty. For the United States, the Central Authority is the Attorney General or persons designated by him. For Argentina, the Central Authority is the Subsecretary of Justice or his designee. Requests are to be made directly between the Central Authorities.

Article 3 sets forth the circumstances under which a Party may deny assistance under the Treaty. The Requested State may deny requests relating to military or political offenses, and requests whose execution would prejudice the security or other essential public interests of the   [*5]   Requested State. Before denying assistance, the Central Authority of the Requested State is required to consult with the Central Authority of the Requesting State to consider whether assistance may be given subject to conditions. The Requesting State is required to comply with any conditions it accepts in order to obtain the assistance sought. If a request is denied, the Requesting State is required to inform the Requesting State of the reasons for denial.

Article 4 prescribes the form and content of written requests under the Treaty, specifying in detail the information required in each case in order to facilitate the most complete execution of a request possible. These requirements are similar to those contained in other mutual legal assistance treaties to which the United States is a Party.

Article 5 requires prompt compliance with a request or, when appropriate, transmittal to the authority having jurisdiction to execute it in the Requested State. That authority is required to do everything in its power to execute the request. The article also states that the judicial authorities of the Requested State shall have jurisdiction to issue subpoenas, search warrants or other orders   [*6]   necessary to execute a request. The Requested State is required to represent the interests of the Requested State in any proceedings related to the request.

Although the request must be executed generally in accordance with the laws of the Requested State, the method of execution specified by the Requested State must be followed, if not prohibited by the laws of the Requested State. This article further permits the Requested State to postpone execution of a request or grant it, subject to conditions, if execution would interfere with an ongoing investigation or proceeding in that State. The Requested State must comply with any conditions it accepts in order to obtain the assistance sought. The Requested State is obliged to use its best efforts to respect any confidentiality requirements specified in the request and to advise the Requesting State before executing a

1990 U.S.T. LEXIS 224, *

request, if such confidentiality cannot be preserved in the process. The Requesting State must be promptly informed of the disposition of the request, whether executed, in whole or in part, or denied.

Article 6 apportions between the two States the costs incurred in executing a request.

Article 7 establishes procedures for [*7]   insuring the confidentiality of requests and their contents and for restricting the use of any information or evidence obtained under the Treaty or derived therefrom.

Article 8 requires the Requested State to compel, if necessary, the taking of testimony of production of documents or other evidence in its territory on behalf of the Requesting State. The article further requires the Requested State to inform the Requesting State of the date and place of the taking of testimony or evidence, and to authorize the presence of any persons specified in the request, such as the accused, counsel for the accused, or other interested persons, and to allow such persons to present questions in accordance with the laws of the Requested State. The article also specifies that any assertion of immunity, incapacity or privilege available under the laws of the Requesting State will be noted for later resolution by the Requesting State but will not preclude the taking of testimony or the production of documents in the Requested State. Finally, the article specifies a procedure for the authentication of business records produced, using forms appended to the Treaty.

Article 9 requires the Requested State [*8]   to provide the Requesting State with copies of publicly available documents, records or information in the possession of government departments and agencies in the Requested State. The Requested State retains the discretion to provide non-public information in such departments' and agencies' possession to the same extent and under the same conditions as they are available to its own law enforcement and judicial authorities. The article specifies alternative procedures for the official authentication of documents produced under this articles and provides for their admissibility in the Requesting State, if such procedures are followed.

Article 10 provides a mechanism for a Requesting State to invite the voluntary appearance and testimony in its territory of a person located in the Requested State. In such a case, the Central Authority of the Requested State is required to invite the person to appear in a non-compulsory manner, indicating the extent to which expenses will be reimbursed by the Requesting State, and to inform the Requesting State promptly of the person's reply.

Article 11 provides for the voluntary transfer to the Requesting State of a person in custody in the Requested [*9]   State, as well as the voluntary transfer to the Requested State of a person in custody in the Requesting State, for purposes of assistance under the Treaty, provided that the Requested State consents. The article provides the express authority for the Receiving State to maintain the person in custody. It further specifies the requirements for keeping the person in custody, insuring his return, and deducting the time spent in custody in one State pursuant to a request made under the Treaty from the time remaining to be served in the other State.

Article 12 requires the Requested State to make its best efforts to ascertain the location or identity of persons, such as witnesses or suspects, specified in a request.

Article 13 obligates the Requested State to use its best efforts to effect service of any document relating to or forming part of a request under the Treaty. Any request for the service of a document requiring a person to appear in the Requesting State must be transmitted in a reasonable time before the scheduled appearance. The Requested State is required to return proof of service as specified in the Request.

Article 14 obligates each State to execute requests for search,   [*10]   seizure and delivery of any item to the Requesting State, if the information contained in the request justifies such action under the laws of the Requested State. The article also creates a mechanism for establishing the continuity of custody, and the identity and integrity of any such item in order to preserve its admissibility in evidence in the Requesting State. The article further provides for the protection of rights of any third parties to such items.

Article 15 requires the Requesting State to return any documents, records or evidence received in execution of a request as soon as possible unless the Requested State waives their return.

Article 16 provides a mechanism for one Central Authority to notify the other when it believes that potentially forfeitable proceeds or instrumentalities of a criminal offense are located in the territory of the other State. The latter State may thereupon submit the information to its authorities who are required to determine the appropriate action in conformity with the laws of that State and report the outcome to the other Party. The article further requires both Parties to assist one another, to the extent permitted by their respective laws,   [*11]   in proceedings relating to such forfeiture, as well as to restitution to victims of crime, and to the collection of fines imposed as sentences in criminal prosecutions.

Article 17 provides that the Treaty does not impede any assistance or procedure available under other international conventions or arrangements or under the domestic laws of the Parties and confirms that assistance may also be provided pursuant to alternative agreements, arrangements and practices.

Article 18 provides for the Parties to consult periodically in order to enable effective implementation of the Treaty.

Article 19 provides that the Treaty shall enter into force upon the exchange of the instruments of ratification and that either Party may terminate the Treaty effective six months after written notice of termination is given to the other Party.

A Technical Analysis explaining in detail the provisions of the Treaty is being prepared by the United States negotiating delegation, consisting of representatives from the Departments of Justice and State, and will be transmitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of [*12] this Treaty by the Senate as soon as possible.

Respectfully submitted,

LAWRENCE S. EAGLEBURGER.

Treaty Between The Government of the United States of America And The Government of the Republic of Argentina On Mutual Legal Assistance in Criminal Matters

The Government of the United States of America and The Government of the Republic of Argentina

Desiring to improve the effectiveness of the law enforcement authorities of both countries in the prevention, investigation, and prosecution of crime through cooperation and mutual legal assistance in criminal matters,

Have agreed as follows:

ARTICLE 1

Scope of Assistance

1. The Contracting Parties shall provide mutual assistance, in accordance with the provisions of this Treaty, in connection with the prevention, investigation, and prosecution of offenses, and in proceedings related to criminal matters.

2. Assistance shall include:

a) taking the testimony or statements of persons;
b) providing documents, records, and articles of evidence;
c) serving documents;
d) locating or identifying persons;
e) transferring persons in custody for testimony or other purposes;
f) executing requests for searches and seizures;
g) immobilizing assets;
h) [*13] assisting in proceedings related to forfeiture, restitution, and collection of fines; and
i) any other form of assistance not prohibited by the laws of the Requested State.

3. Assistance shall be provided without regard to whether the conduct which is the subject of the investigation, prosecution, or proceeding in the Requesting State would constitute an offense under the laws of the Requested State.

4. This Treaty is intended solely for mutual legal assistance between the Parties. The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

ARTICLE 2

Central Authorities

1. Each Contracting Party shall designate a Central Authority to make and receive requests pursuant to this Treaty.

1990 U.S.T. LEXIS 224, *

2. For the United States of America, the Central Authority shall be the Attorney General or the persons designated by him. For the Republic of Argentina, the Central Authority shall be the Subsecretary of Justice or the persons designated by him.

3. The Central Authorities shall communicate directly with one another for the purposes of this Treaty.

ARTICLE 3

Limitations on Assistance [*14]

1. The Central Authority of the Requested State may deny assistance if:

a) the request relates to a political offense or an offense under military law which would not be an offense under ordinary criminal law; or

b) the execution of the request would prejudice the security or similar essential interests of the Requested State.

2. Before denying assistance pursuant to this Article, the Central Authority of the Requested State shall consult with the Central Authority of the Requesting State to consider whether assistance can be given subject to such conditions as it deems necessary. If the Requesting State accepts assistance subject to these conditions, it shall comply with the conditions.

3. If the Central Authority of the Requested State denies assistance, it shall inform the Central Authority of the Requesting State of the reasons for the denial.

ARTICLE 4

Form and Content of Requests

1. A request for assistance shall be in writing except that the Central Authority of the Requested State may accept a request in another form in urgent situations. In any such case, the request shall be confirmed in writing within ten days thereafter unless the Central Authority of the Requested State [*15] agrees otherwise. The request shall be in the language of the Requested State unless otherwise agreed.

2. The request shall include the following:

a) the name of the authority conducting the investigation, prosecution, or proceeding to which the request relates;

b) a description of the subject matter and nature of the investigation, prosecution, or proceeding, including the specific criminal offenses which relate to the matter;

c) a description of the evidence, information, or other assistance sought; and

d) a statement of the purpose for which the evidence, information, or other assistance is sought.

3. To the extent necessary and possible, a request shall also include:

a) information on the identity and location of any person from whom evidence is sought;

b) information on the identity and location of a person to be served, that person's relationship to the proceedings, and the manner in which service is to be made;

c) information on the identity and whereabouts of a person to be located;

d) a precise description of the place or identification of the person to be searched and of the articles to be seized;

e) a description of the manner in which any testimony or statement is to be [*16] taken and recorded;

f) a list of questions to be asked;

g) a description of any particular procedure to be followed in executing the request;

h) information as to the fees and expenses to which a person asked to appear in the Requesting State will be entitled; and

i) any other information which may be brought to the attention of the Requested State to facilitate its execution of the request.

1990 U.S.T. LEXIS 224, *

## ARTICLE 5

Execution of Requests

1. The Central Authority of the Requested State shall promptly execute the request or, when appropriate, transmit it to the authority having jurisdiction to do so. The competent authorities of the Requested State shall do everything in their power to execute the request. The Courts of the Requested State shall have authority to issue subpoenas, search warrants, or other orders necessary to execute the request.

2. When necessary, the request shall be presented to the appropriate authority by the persons designated by the Central Authority of the Requested State. Such persons shall be legally authorized to act in any proceedings related to the request.

3. Requests shall be executed in accordance with the laws of the Requested State except to the extent that this Treaty [*17]   provides otherwise. However, the method of execution specified in the request shall be followed except insofar as it is prohibited by the laws of the Requested State.

4. If the Central Authority of the Requested State determines that execution of a request would interfere with an ongoing criminal investigation or proceeding in that State, it may postpone execution, or make execution subject to conditions determined to be necessary after consultations with the Central Authority of the Requesting State. If the Requesting State accepts the assistance subject to the conditions, it shall comply with the conditions.

5. The Requested State shall use its best efforts to keep confidential a request and its contents if such confidentiality is requested by the Central Authority of the Requesting State. If the request cannot be executed without breaching the requested confidentiality, the Central Authority of the Requested State shall so inform the Central Authority of the Requesting State, which shall then determine whether the request should nevertheless be executed.

6. The Central Authority of the Requested State shall respond to reasonable inquiries by the Central Authority of the Requesting [*18]   State concerning progress toward execution of the request.

7. The Central Authority of the Requested State shall promptly inform the Central Authority of the Requesting State of the outcome of the execution of the request. If the request is not executed, the Central Authority of the Requested State shall inform the Central Authority of the Requesting State of the reasons for the failure to execute.

## ARTICLE 6

Costs

The Requested State shall pay all costs relating to the execution of the request, except for the fees of expert witnesses, the costs of translation and transcription, and the fees and expenses related to travel of persons pursuant to Articles 10 and 11, which fees and expenses shall be paid by the Requesting State.

## ARTICLE 7

Limitations on Use

1. The Requesting State shall not use any information or evidence obtained under this Treaty in any investigation, prosecution, or proceeding other than that described in the request without the prior consent of the Requested State.

2. The Central Authority of the Requested State may request that information or evidence furnished under this Treaty be kept confidential in accordance with conditions which its Central Authority shall   [*19]   specify. In that case, the Requesting State shall use its best efforts to comply with the conditions specified.

3. Information or evidence which has been made public as a result of the investigation, prosecution or proceeding in the Requesting State in accordance with paragraph 1 or 2 may thereafter be used for any purpose.

## ARTICLE 8

Taking Testimony and Evidence in the Requested State

1. A person in the Requested State from whom evidence is requested pursuant to this Treaty shall be compelled, if necessary, to appear and testify or produce documents, records, or articles of evidence.

2. Upon request, the Central Authority of the Requested State shall furnish information in advance about the date and place of the taking of the testimony or evidence pursuant to this article.

3. The Requested State shall authorize the presence of such persons as specified in the request during the execution of the request, and shall allow such persons to present questions in accordance with the laws of the Requested State.

4. If the person referred to in paragraph 1 asserts a claim of immunity, incapacity, or privilege under the laws of the Requesting State, the testimony or evidence shall nonetheless [*20] be taken and the claim made known to the Central Authority of the Requesting State for resolution by the authorities of that State.

5. Documents, records, and articles of evidence produced in the Requested State or which are the subject of testimony taken under this article may be authenticated by an attestation. In the case of business records, authentication shall be made in the manner indicated in Form A appended to this Treaty. Documents authenticated by Form A shall be admissible in evidence in the Requesting State as proof of the truth of the matters set forth therein.

ARTICLE 9

Records of Government Agencies

1. Upon request, the Requested State shall provide the Requesting State with copies of publicly available documents, records, or information in the possession of government departments and agencies in the Requested State.

2. The Requested State may provide copies of any documents, records, or information which are in the possession of a government department or agency in that State but which are not publicly available, to the same extent and under the same conditions as it would be available to its own law enforcement or judicial authorities. The Requested State may in [*21] its discretion deny a request pursuant to this paragraph entirely or in part.

3. Official records produced pursuant to this Article may be authenticated under the provisions of the Convention Abolishing the Requirement of Legalization for Foreign Public Documents dated 5 October 1961 and, if that Convention is not applicable, by the official in charge of maintaining them through the use of Form B appended to this Treaty. No further authentication shall be necessary. Documents authenticated under this paragraph shall be admissible in evidence in the Requesting State.

ARTICLE 10

Testimony in the Requesting State

When the Requesting State requests the appearance of a person in that State, the Requested State shall invite the person to appear before the appropriate authority in the Requesting State. The Requesting State shall indicate the extent to which the expenses will be paid. The Central Authority of the Requested State shall promptly inform the Central Authority of the Requesting State of the response of the person.

ARTICLE 11

Transfer of Persons in Custody

1. A person in the custody of the Requested State whose presence in the Requesting State is needed for purposes of assistance [*22] under this Treaty shall be transferred from the Requested State for that purpose if both the person and the Central Authority of the Requested State consent to the transfer.

2. A person in the custody of the Requesting State whose presence in the Requested State is needed for purposes of assistance under this Treaty may be transferred to the Requested State if the person consents and if the Central Authorities of both States agree.

3. For purposes of this Article:

a) the receiving State shall have the authority and the obligation to keep the person transferred in custody unless otherwise authorized by the sending State;

b) the receiving State shall return the person transferred to the custody of the sending State as soon as circumstances permit or as otherwise agreed by both Central Authorities;

c) the receiving State shall not require the sending State to initiate extradition proceedings for the return of the person transferred; and

d) the person transferred shall receive credit for service of any sentence imposed in the sending State for time served in the custody of the receiving State.

1990 U.S.T. LEXIS 224, *

## ARTICLE 12

Location or Identification of Persons

The Requested State shall use its best efforts [*23]   to ascertain the location or identity of persons specified in the request.

## ARTICLE 13

Service of Documents

1. The Requested State shall use its best efforts to effect service of any documents relating to or forming part of any request for assistance made by the Requesting State under the provisions of this Treaty.

2. The Requesting State shall transmit any request for the service of a document requiring the appearance of a person before an authority in the Requesting State a reasonable time before the scheduled appearance.

3. The Requested State shall return a proof of service in the manner specified in the Request.

## ARTICLE 14

Search and Seizure

1. The Requested State shall execute a request for the search, seizure, and delivery to the Requesting State of any document, record, or article, if the request includes the information justifying such action under the laws of the Requested State.

2. Upon request, every official who has custody of a seized article shall certify, through the use of Form C appended to this Treaty, the continuity of custody, the identify of the article, and the integrity of its condition. No further certification shall be required. The certificates shall be admissible [*24]   in evidence in the Requesting State as proof of the truth of the matters set forth therein.

3. The Central Authority of the Requested State may require that the Requesting State agree to terms and conditions deemed necessary to protect third party interests in the document, record, or article to be transferred.

## ARTICLE 15

Return of Documents, Records, and Articles of Evidence

The Central Authority of the Requesting State shall return any documents, records, or articles of evidence furnished to it in execution of a request under this Treaty as soon as possible unless the Central Authority of the Requested State waives their return.

## ARTICLE 16

Assistance in Forfeiture Proceedings

1. If the Central Authority of one Party becomes aware of fruits or instrumentalities of offenses which are located in the territory of the other Party and may be forfeitable or otherwise subject to seizure under the laws of that State, it may so inform the Central Authority of the other Party. If that other Party has jurisdiction in this regard it may present this information to its authorities for a determination whether any action is appropriate. These authorities shall issue their decision in accordance [*25]   with the laws of their country, and shall, through their Central Authority, report to the other Party on the outcome of the decision.

2. The Contracting Parties shall assist each other to the extent permitted by their respective laws in proceedings relating to the forfeiture of the fruits and instrumentalities of offenses, restitution to the victims of crime, as well as the collection of fines imposed by judicial order.

3. A Requested Party in control of forfeited assets shall dispose of them in accordance with its law. To the extent permitted by its laws and upon such terms as it considers reasonable, either Party may transfer forfeited assets or the proceeds of their sale to the other Party.

## ARTICLE 17

Compatibility with Other Treaties, Agreements, or Arrangements

1990 U.S.T. LEXIS 224, *

Assistance and procedures set forth in this Treaty shall not prevent either Contracting Party from granting assistance to the other Party through the provisions of other international agreements to which it may be a party, or through the provisions of its national laws. The Parties may also provide assistance pursuant to any bilateral arrangement, agreement, or practice which may be applicable.

ARTICLE 18

Consultation [*26]

The Central Authorities of the Contracting Parties shall consult, at times mutually agreed to by them, to enable the most effective use to be made of this Treaty.

ARTICLE 19

Ratification, Entry Into Force, and Termination

1. This Treaty shall be subject to ratification, and the instruments of ratification shall be exchanged at Washington, D.C. as soon as possible.

2. This Treaty shall enter into force upon the exchange of instruments of ratification.

3. Either Party may terminate this Treaty by means of written notice to the other Party. Termination shall take effect six months following the date of notification.

DONE in Buenos Aires, this 4 day of December, 1990, in two originals, in the English and Spanish languages, both texts being equally authentic.

FOR THE GOVERNMENT OF THE UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF THE REPUBLIC OF ARGENTINA:

Form A

CERTIFICATE OF AUTHENTICITY OF BUSINESS RECORDS

I, ___ (Name), attest on penalty of criminal punishment for false statement or false attestation that I am employed by ___ (Name of Business from which documents are sought) and that my official title is ___ (Official Title). I further state that each of the records attached [*27] hereto is the original or a duplicate of the original records in the custody of ___ (Name of Business from which documents are sought).

I further state that:

A) such records were made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;

B) such records were kept in the course of a regularly conducted business activity;

C) the business activity made such records as a regular practice; and

D) if such record is not the original, such record is a duplicate of the original.

___ Signature     ___ Date

Sworn to or affirmed before me, ___ (Name), a ___, (Judge, Magistrate, or Commissioner of the Court) this ___ day of ___, 19__.

Form B

ATTESTATION OF AUTHENTICITY OF FOREIGN PUBLIC DOCUMENTS

I, ___ (Name), attest on penalty of criminal punishment for false statement or attestation that my position with the Government of ___ (Country) is ___ (Official Title) and that in that position I am authorized by law of ___ (Country) to attest that the documents attached and described below are true and accurate copies of original official records which

1990 U.S.T. LEXIS 224, *

are recorded or filed in ___ (Name of Office or Agency),  [*28]  which is a government office or agency of the Government of ___ (Country).

Description of Documents:

    ___ (Signature)

    ___ (Title)

    ___ (Date)

    Form C

    ATTESTATION WITH RESPECT TO SEIZED ARTICLES

    I, ___ (Name), attest on penalty of criminal punishment for false statement or attestation that my position with the Government of ___ (Country) is ___ (Title). I received custody of the articles listed below from ___ (Name of Person) on ___ (Date), at ___ (Place). I relinquished custody of the articles listed below to ___ (Name of Person) on ___ (Date), at ___ (Place) in the same condition as when I received them (or, if different, as noted below).
Description of Articles:

Changes in Condition while in my custody:

Official Seal

    ___ Signature

    ___ Title

    ___ Place

    ___ Date



*Ministerio de Justicia*
*y Derechos Humanos*

CUDAP: EXP-S04:0042170/2014
NOTA S04: 1423/15

BUENOS AIRES, 0 9 ENE 2015

**New case**

OFFICE OF INTERNATIONAL AFFAIRS
UNITED STATES DEPARTMENT OF JUSTICE
S _____/_____ D

Dr. Sebastián Alejandro Rey
Director Nacional de Cooperación
Internacional Jurídica y en Sistemas Judiciales
Ministerio de Justicia y Derechos Humanos

182-49603



*Ministerio de Justicia*
*y Derechos Humanos*

CUDAP: EXP-S04:0042170/2014
NOTA S04: 1423/15

BUENOS AIRES, 09 ENE 2015

**New case**

OFFICE OF INTERNATIONAL AFFAIRS
UNITED STATES DEPARTMENT OF JUSTICE
S_____/_____D

Dr. Sebastián Alejandro Rey
Director Nacional de Cooperación
Internacional Jurídica y en Sistemas Judiciales
Ministerio de Justicia y Derechos Humanos

182-49603

*Traducción Pública  / Certified Translation* ------

*[The original document consists of three pages. [On the left margin there appears]*: OFFICIAL USE ------------------

The Argentine Federal Judiciary---------------------------

*[Stamp: Coat-of-arms – Federal Court for Criminal and Correctional Matters] [Signature: Miguel Angel Ambrosio Federal Court Clerk]*-----------------------------------

**Letter of Request**----------------------------------------------

THE HONORABLE RODOLFO CANICOBA CORRAL, PRESIDING JUDGE OF THE FEDERAL COURT FOR CRIMINAL AND CORRECTIONAL MATTERS No 6 IN AND FOR THE CITY OF BUENOS AIRES, ARGENTINE REPUBLIC PRESENTS ITS COMPLIMENTS TO THE APPROPRIATE JUDICIAL AUTHORITY HAVING JURISDICTION AND VENUE IN THE UNITED STATES AND RESPECTFULLY REQUESTS AND INFORMS: -------------

That before this Federal Court for Criminal and Correctional Matters N°6, Court Clerk's Office N° 11 headed by Miguel Angel Ambrosio, Esq. the Case No 17.057/2013 "GARCIA APARICIO, Federico /on fraud" is now pending, and in connection therewith the issue of this letter of request has been ordered under the Treaty on Mutual Judicial Assistance in Criminal Matters between the United States of America and the Argentine Republic. The assistance requested is that the appropriate judicial authority

informs this court whether **account No.** 632 was open between March 1 and August 23, 2010 at the Espirito Santo Bank, and in that case to inform the name of the account holder/s and person/s authorized to operate the account. Furthermore, and in connection with the mentioned account, assistance is requested to obtain and forward to this court proof of all activity in the account (debits / credits) for the period March 1, 2010 and December 31, 2012, providing for all transactions, in addition to the date and amount, the name and any other information regarding the relationship of the person/s that made the deposits, withdrawals or transfers, or alternatively the number of the accounts from / to which the transfers were made and the relevant bank. ---------------------------------------

Assistance is also requested in obtaining identical information for **account No.** 1506 in the Total Bank in Miami, and for **account No.** 17278 in the Wachovia Bank NA.------------------------------------------------------

In order to comply with article 4 of the referenced Treaty, this court informs that this letter of request is made in connection with the above mentioned case initiated on April 16, 2013 by a complaint filed with the Federal Appeals Court for Criminal and Correctional Matters by Victoria

Clavo on behalf of Lars Johan Runarsson a Swedish national residing in his country.  In this case, the application is investigated of the sum of One Million United States dollars to a juridical act OK formalized in Argentina, which amount might have a possible illegal origin. This business had allegedly consisted in the acquisition of the Mutual organization AMUPROBA in October 2010 by Federico Garcia Aparicio with the money invested to that purpose by Lars Johan Runarsson. The mentioned individuals had been introduced to each other by a common friend named Mats Tommy Haqvist, who put Runarsson in touch with Garcia Aparicio. According to Runarsson, Garcia Aparicio had allegedly proposed him this investment for a 18-month period expecting to collect at the end of said period the principal plus the interest accrued, which would amount to a total of two and a half million U.S. dollars. In the case, it was alleged that Runarsson had transferred the investment money from the Nordea Bank of Luxembourg through six transactions: The first one on March 1, 2010 to account No        -632 in the Spirito Santo Bank for one hundred thousand U.S. dollars; the second on March 9, 2010 to account No        7278 of the company The Winterbotham Trust Company Ltd. in Wachovia Bank N.A. for one hundred

and fifty thousand U.S. dollars; the third on March 9, 2010
to account No      632 in the Spririto Santo Bank for
one thousand U.S. dollars; the fourth on March 17, 2010 to
account No      1506 in the Total Bank of Miami for three
hundred and fifty thousand U.S. dollars; the fifth on July
19, 2010 to account No      632 in the Spirito Santo
Bank for one hundred and fifty-five thousand U.S. dollars;
the sixth on August 23, 2010 to account      632 in the
Spirito Santo Bank for one hundred and fifty thousand U.S.
dollars. These transfers, according to complainant should
have been made under the instructions of Eduardo Daniel
Sinópoli, owner of the Panamanian company Lipsel Finance
S.A. and presumably holder of account No      632 in the
Spirito Santo Bank. Then, the money has allegedly entered
this country and had allegedly been applied to the
acquisition of the Mutual but Runarsson never received the
money promised to him after expiration of the agreed term.
In view thereof, the mentioned person filed a petition for
an injunction with the Eleventh Judicial Circuit Court in
and for Miami Dade, Florida, U.S.A. under which an
agreement was reached with Lipsel Finance S.A. Under the
agreement the latter agreed to the restitution of sixty-two
thousand U.S. dollars but failed to admit any

responsibility for the act. It is finally worth mentioning that when establishing the Court jurisdiction over the case, the National Court of Appeals for Criminal and Correctional Matters *[Cámara Nacional de Apelaciones en lo Criminal y Correctional]* held that the business subject matter of the complaint is noticeably in terms of the multi-million dollar returns it offered in such a short period of time, and branded as suspicious the transfers made to accounts held by individuals who were presumably not involved in the business. The Court further pointed out the participation of a financial company - Lipsel Finance S.A. - based in a country which is considered a tax haven. Because of these circumstances, the facts might fall within the provisions of Chapter XIII -Financial Economic Crimes- of the Argentine Criminal Code. Specifically, Section 303 of the mentioned code establishes that "1) Anyone who converts, transfers, manages, sells, encumbers, disguises, or otherwise brings into market circulation any assets obtained from criminal activity, thus possibly causing such illicit assets or their products to appear as having a legal origin, provided that their value exceeds the sum of three-hundred thousand pesos (AR$300,000) whether in a single operation or through the repetition of several

related operations shall be punished with three (3) to ten (10) years' imprisonment and a fine of two (2) to ten (10) times the amount of the transaction. 2) The penalty stated in subsection 1) is increased by one-third of the maximum and by half of the minimum in the following cases: a) when the ofender's actions are habitual or if he or she acts with an organization or group formed to regularly commit acts of this nature; b) when the offender is a public official who has committed the offence when performing or failing to perform his or her duties. In this case, a special disqualification sanction of three (3) to ten (10) years will also apply. The same penalty shall also apply to the offender who had acted in the exercise of a profession or occupation that requires special authorisation. 3) Anyone who receives the proceeds of a crime, whether money or other assets in order to have them applied to an operation as described in subsection 1) giving it the appearance of possible lawful origin will be punished with six (6) months to (3) three years of imprisonment. 4) If the value of the assets does not exceed the amount mentioned in subsection 1), the offence is punishable with six (6) months to three (3) years' imprisonment. 5) The provisions of this section will apply even if the original

offence took place outside Argentina, provided the original offence is also punishable in the foreign jurisdiction."--- Finally, the appropriate judicial authority of the U.S. is informed that the measures sought are intended to confirm whether the mentioned amount in fact was received in the accounts mentioned under the six described operations, and, in that case, to determine the movements of the funds after the deposit; this in order to establish if and how the money entered the country.--------------------------------- This court respectfully asks the appropriate judicial authority in the U.S. to duly comply with this request, and offer similar cooperation and assistance to the judicial authorities of the United States in the event that the United States requests similar assistance.----------------- Signed, sealed and delivered in the city of Buenos Aires, on this 9th day of October of the year 2014.--------------- *[Signature and stamp]*: Miguel Angel Ambrosio - Federal Court Clerk------------------------------------------------- *[Signature and stamp]*: Rodolfo Canicoba Corral - Federal Judge------------------------------------------------------- *[Stamp]*: Federal Court for Criminal and Correctional Matters No 6. Court Clerk's Office No 11.-------------------

//CERTIFY as required by law that the signature that appears on the back of this letter of request is that of the Court Clerk's Miguel Angel Ambrosio head of Court Clerk's Office No 11 of this Federal Court for Criminal and Correctional Matters Nº 6 presided by me. All of which I attest. Buenos Aires, October 14, 2014. --------------------

*[Signature and stamp]: Rodolfo Canicoba Corral - Federal Judge----------------------------------------------------*

The underwriter, President of the National Court for Criminal and Correctional Matters for the Federal Capital of the Argentine Republic hereby certifies that the signature that appears above is that of Federal Judge Rodolfo Canicoba Corral. Buenos Aires, October 15, 2014.

*[Signature and stamp]: Martin Irurzun - President ----------*

*I hereby certify that the foregoing is a true translation into English of the instrument in Spanish attached hereto, in Buenos Aires, November 10, 2014. --------------------*

*ES TRADUCCIÓN FIEL al inglés del documento original adjunto redactado en español al cual me remito y he tenido a la vista en Buenos Aires, a los 10 días del mes de noviembre de 2014. ----------------------------------------------------*





COLEGIO DE TRADUCTORES PÚBLICOS
DE LA CIUDAD DE BUENOS AIRES
Corresponde a la Legalización
Nº 72028/14
FRANCO MAGGIORINI

MARIA GRACIELA SILLITTI
TRADUCTORA PÚBLICA - INGLES
C.T.P.C.B.A. TºXI Fº199
MATRÍCULA 3371